# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DONALD WALLACE,                          )
                                                               )
        Petitioner,                    )           Case No. 3:10-0521
                                                  )           Chief Judge Haynes
v.                                                 )
                                                         )
DAVID A. SEXTON, Warden,                )
                                                         )
        Respondent,              )

## MEMORANDUM

Petitioner, Donald Wallace, filed this action under 28 U.S.C. § 2254 seeking the writ of habeas corpus to set aside his state conviction for second degree murder for which he received a twenty-five (25) year sentence. After a review of the petition, the Court appointed the Federal Public Defender to represent Petitioner and ordered a filing of claims, defenses and the pertinent parts of the state record. (Docket Entry No. 28). Petitioner asserts the following claims: (1) ineffective assistance of trial counsel; (2) the State withholding of material exculpatory evidence; (3) the State prosecutor's improper closing argument; (4) the trial court's comments to the jury about the "Murder Weapon" as denying Petitioner a fair trial and an impartial jury; (5) the trial court's admission of detailed graphic testimony and photographs of the human tissue of the victim's body found at the scene, denied Petitioner a fair trial and an impartial jury; and (6) that the cumulative effect of Claims 3, 4 and 5 denied Petitioner a fair trial and an impartial jury.

Before the Court is Respondent's motion for judgment on the pleadings (Docket Entry No. 33) contending, in sum, that Petitioner's claims of ineffective assistance of counsel for trial counsel's failures: to pursue an accidental shooing theory; to present proof challenging that the weapon did not

1

have a hair trigger; to request jury instruction on self-defense or accident; to object to photographs and graphic testimony; to object to the prosecutor's closing argument; and to ensure an accurate pesentence report are procedurally defaulted. Respondent also asserts that Petitioner's claim concerning the prosecutor's closing argument is procedurally defaulted under Tennessee waiver statue. For Petitioner's exhausted claims, Respondent argues that those claims reasonably applied clearly established federal law.

## A. State Procedural History

Petitioner was charged with the first degree murder of his girl friend and after a trial, the jury convicted Petitioner of first degree murder and the trial count sentenced Petitioner to life imprisonment. In his initial direct appeal, State v. Wallace, 1998 WL 670627 (Tenn. Ct. Crim. App. Sept. 30, 1998), ("Wallace I") the Tennessee Court of Criminal Appeals set aside Petitioner's first degree murder conviction and reduced the offense to second degree murder concluding that the State's evidence did not prove premeditation beyond a reasonable doubt. Id. at *5-6. The Tennessee appellate court, however, found review of Petitioner's other claims "waived" due to Petitioner's failure to file a timely motion for a new trial. Id. at *4. At his re-sentencing, Petitioner was sentenced to twenty-five (25) years. Thereafter, Petitioner filed a second appeal, State v. Wallace, 1999 WL 1073705 (Tenn. Crim. App. 1999) ("Wallace II") that affirmed his sentence and conviction.

Petitioner then filed his first state post-conviction that the trial court denied. Petitioner did not appeal, but after the trial court denied his new motion for a new trial, Petitioner appealed and the Tennessee Court of Criminal Appeals affirmed. Donald Wallace v. State, No. M2001-02722-CCA-R3-PC (Tenn. Ct. Crim. App., Dec. 9, 2002) (Wallace III). The Supreme Court,

however, granted a discretionary appeal and reserved holding that "counsel's performance following the defendant's conviction was deficient and presumptively prejudicial." Wallace v. State, 121 S.W.3d 652 (Tenn. 2003) ("Wallace IV"). The Tennessee Supreme Court found that as a direct result of his counsel's ineffective assistance, Petitioner was procedurally barred from pursuing issues on appeal. Id. at 660. Tennessee Supreme Court remanded the action "for review of the issues presented by the defendant's appeal from the trial court's denial of his motion for a new trial." Id.

During the pendency of his sentencing appeal in Wallace II, Petitioner filed a second petition for post-conviction relief that was denied. Wallace v. State, 2005 WL 292438, at *1 (Tenn. Ct. Crim. App. Jan. 31, 2005) ("Wallace V"). In his fifth appeal, the Tennessee appellate court considered Petitioner's claims concerning the admission of hearsay and prosecutorial misconduct in withholding "certain exculpatory materials." Id. at 1, 4-5, 5-6.

Petitioner then filed a third state post-conviction petition with claims of ineffective assistance of counsel and prosecutorial misconduct for improper argument and vouching for a witness's credibility. The trial court denied the petition and on appeal the Tennessee appellate court affirmed. Wallace v. State, 2009 WL 3031261 (Tenn. Ct. Crim. App. Sept. 23, 2009) ("Wallace VI"). On March 25, 2010, the Tennessee Supreme Court denied permission to appeal.

## I. Procedural Defaults

Respondent challenges, as procedurally defaulted, Petitioner's claims that his trial counsel failed to present the theory that the shooting was an accident; failed to request jury instructions regarding accident or self-defense; failed to present evidence that the shotgun that killed Petitioner's girlfriend had a hair trigger; failed to provide proper advice in discouraging Petitioner from testifying at trial; failed to ensure that an accurate pre-sentence report was prepared before sentencing (Docket

Entry No. 34 at 6-9, 14); failed to object to admission of graphic testimony and pictures of the crime scene, and failed to object to the prosecutor's and court's prejudicial comments (Docket Entry No.34, p. 9-13).

"Procedural Default Doctrine is an extension of the comity policy that underscores the exhaustion doctrine and bars consideration of a federal claim in a habeas action absent a showing of cause and prejudice or actual innocence. As defined by the Supreme Court, under this doctrine:

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. **This rule applies whether the state law ground is substantive or procedural.** In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. **Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory...**
>
>         *     *     *
>
> **... the doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.** In these cases, the state judgment rests on an independent and adequate state procedural ground.

Coleman v. Thompson, 501 U.S.722, 729-30 (1992) (emphasis added and citations omitted).

The rationale for this doctrine arises out of federal respect for federalism and maintaining comity with state courts:

> In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without a rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.
>
>         *     *     *
>
> [A] habeas petitioner who has failed to meet the State's procedural requirements for

presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance. . . .In the absence of an independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the State's interest in correcting their own mistakes is respected in all federal habeas cases.

Id. at 730-32.

The Supreme Court further recognized that state procedural rules also serve a legitimate state interest in finality of criminal convictions:

[p]lainly the interest in finality is the same with regard to both federal and state prisoners. . . . There is no reason to . . . give greater preclusive effect to procedural defaults by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations.

Francis v. Henderson, 425 U.S. 536, 542(1976) (quoting Kaufman v. United States, 394 U.S. 217, 228 (1969)).

In Murray v. Carrier, 477 U.S. 478 (1986), the Supreme Court noted that state procedural rules channel the controversy to the state trial and appellate courts.

[A] state's procedural rules serve vital purposes at trial, on appeal, and on state collateral attack . . . Each state's compliment of procedural rules . . . channel[s] to the extent possible, the resolution of various types of questions to the stage of the judicial process at which they can be resolved most fairly and efficiently. Failure to raise a claim on appeal reduces the finality of appellate proceedings, deprives the appellate court of an opportunity to review trial error, and undercut[s] the state's ability to enforce its procedural rule[s].

Id. at 490-91 (quoting Engle v. Isaac, 456 U.S. 107, 129 (1982)).

The procedural default doctrine applies only to firmly established and "regularly followed" state procedural rules. Johnson v. Mississippi, 486 U.S. 578, 587 (1988). Moreover, if the state court did not determine whether a petitioner's claims were procedurally defaulted under state law, then the District Court is to consider whether the state court would bar the claims, if those claims

were presented to the state courts.  Engle, 456 U.S. at 125-26, n.26.  If the state decision is unclear, then the same rule obtains and the Court examines the briefs of the parties in the state courts.  Bagby v. Sowders, 853 F.2d 1340, 1348 (6th Cir. 1988).

Once procedural default on a state rule is established, the federal petitioner must establish cause and prejudice to excuse such non-compliance.  Carrier, 477 U.S. at 488.  The procedural default doctrine also does not preclude federal habeas review if the petitioner has an error-free trial, but makes a showing of actual innocence of the offense with clear and convincing evidence that reveals a fundamental miscarriage of justice.  Sawyer v. Whitley, 505 U.S. 333, 336 (1992).

In the Sixth Circuit, the analysis under the procedural default doctrine was set forth by the Court of Appeals in the oft-cited Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis.  First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.

*   *   *

> Second, the court must decide whether the state courts actually enforced the state procedural sanction.

*   *   *

> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.  This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Id. at 138 (citations omitted).

From the Court's review, Petitioner's above claims of ineffective assistance of counsel,

were not fully exhausted in the state courts, as Petitioner did not present those claims in the post-conviction proceedings. Petitioner also did not present these claims to the Tennessee Supreme Court after the state appellate court confirmed his conviction. Thus, the Court concludes Petitioner's aforementioned ineffective assistance of counsel claims are procedurally defaulted.

Under Tennessee law, "[a] ground for relief [in] in a post-conviction proceeding] is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction," as here, on appeal from the judgment of the trial court. Tenn. Code Ann. § 40-30-106(g). The Sixth Circuit has also found that the Tennessee waiver statute, Tenn. Code Ann. § 40-30-106(g), to be an independent and adequate state rule that is regularly enforced. Cone v. Bell, 243 F.3d 961, 969 (6th Cir. 2001), overruled on other grounds by Bell v. Cone, 535 U.S. 685 (2002)).

If a petitioner has not exhausted his claims, but is now procedurally barred from doing so, he must show "cause for the noncompliance" and "actual prejudice resulting from the alleged constitutional violation." Wainwright v. Sykes, 433 U.S. 72, 84 (1977). Procedural default may also be excused "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496.

To show cause, Petitioner must show that some objective factor impeded his counsel's compliance with the State's procedural rule. See id. at 488. Objective factors include interference by public officials, ineffective assistance of counsel, of unavailability of factual or legal basis for a claim. Id. Where a Petitioner "makes no argument that this procedural default should be excused, under either the cause-and-prejudice or miscarriage of justice exceptions" these claims shall be dismissed. Rayner v. Mills, 685 F.3d 631, 644 (6th Cir. 2012).

7

Petitioner contends he was denied a right to a fair trial and an impartial jury when the trial court referred to the shotgun as the "murder weapon." This claim was not sufficiently presented to the state courts and is barred under Coleman. State procedural rules that channel the controversy to the state trial and appellate courts must be honored because failure to do so "deprives the [state] appellate court of an opportunity to review trial error, and 'undercut[s] the State's ability to enforce its procedural rule[s]'" Murray, 477 U.S. at 491. Tennessee's waiver statute has been held to serve a legitimate state interest and is regularly enforced for purposes of procedural default. See Hutchison v. Bell, 303 F.3d 720, 738 (6th Cir. 2002). Petitioner did not sufficiently present this claim before the state courts, and under state rules that claim is waived. Thus, under Coleman, the Court concludes this claim is procedurally barred without any showing of cause or prejudice.

Petitioner next contends that he was denied a right to a fair trial and an impartial jury when the trial court admitted detailed, graphic testimony into evidence. Upon the Court's review, Petitioner also raises this claim for the first time in his petition for habeas corpus relief. Thus, the Court concludes that this claim is procedurally barred under Coleman.

Petitioner further contends that the "cumulative effects of claims 3, 4, and 5" denied him a fair trial and an impartial jury. The Court need not address Petitioner's cumulative error claim in this action. "[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006).

## II. Petitioner's Exhausted Claims

### A. Review of the State Record

## 1. State Court Findings

As to the facts underlying Petitioner's conviction, the Tennessee Court of Criminal Appeals found the following facts:[1]

> Sometime on the afternoon of June 8, 1996, the appellant, accompanied by his girlfriend, Melinda Sue Perrin, traveled to the home of the appellant's life-time friend, Charles Morgan. Shortly after the couple's arrival, the appellant asked Morgan if he could borrow Morgan's twelve-gauge pump shotgun. Both the stock and the barrel of this particular shotgun had been shortened. FN1 The weapon was described as being "sawed-off," approximately fourteen to sixteen inches in overall length with "a pistol grip handle." Although Morgan stated that he would not loan the appellant the shotgun, the appellant continued in his request, explaining to Morgan that he needed the shotgun for protection because somebody was threatening to kill him. Although hesitant, Morgan eventually agreed to sell the weapon along with two shells of number six shot to the appellant for one hundred dollars. Melinda Perrin paid for the weapon with a hundred dollar bill.

>> FN1. Additionally, Morgan testified that, in order to fire the gun, the safety catch must be off, the chamber must be loaded, and the shotgun pumped and fired.

> After the sale was completed, Melinda mentioned that she was going to stay at Morgan's residence. Irritated by this comment, the appellant left the residence, got into his car, and began to back out of the driveway. Before the appellant got out of the driveway, Melinda caught up with him and got into the car.

> After leaving Morgan's mobile home, the couple traveled to Clarksville, arriving at the residence of Norman and Linda Wallace around 3:00 p.m.FN2 Melinda carried a six pack of Zima, an alcoholic beverage, into the Wallaces' home. Thirty to forty-five minutes after they arrived, the appellant and Nom1an left in the appellant's car. Norman insisted on driving because the appellant had been drinking beer. They first drove to the home of the appellant's mother, and, then, the appellant asked Norman to drive him to Indian Mound. The appellant stated that he needed to talk to a man named "Red." He explained that he owed Red some money. As a result of this debt, Red had made threats against the appellant's mother and Melinda. The appellant hoped to make arrangements with Red to pay him back and to stop the threats to his mother and Melinda.

---

[1] State appellate court opinion findings can constitute factual findings in a habeas action. Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness 28 U.S.C. § 2254(e).

Norman Wallace is the appellant's third or fourth cousin and has known the appellant his entire life.

Just prior to reaching the Stewart County line, one of the tires on the appellant's dark blue Chrysler Fifth Avenue went flat. While the appellant was changing the tire, Norman noticed the shotgun, a box of ammunition, and a .22 target pistol in the car. The appellant stated that he and Melinda had just bought the gun. Once the tire was changed, the two continued to Indian Mound. Before reaching Red's house, the appellant asked Norman where the safety was on the shotgun. At trial, Norman testified that it was during this time that he believed the appellant loaded the weapon.

When they arrived at Red's house, the appellant instructed Norman to turn the vehicle around so that the passenger side was facing the front of Red's house. He told Norman that he was afraid that Red would come out shooting. However, Red was not at home. Norman then drove the appellant to the residence of Junior Shepard in Big Rock. Junior's wife, Beverly, came out to the car and told the appellant to leave or she would call the police.

Meanwhile, Melinda remained in Clarksville with Linda Wallace. Linda, a former beautician, cut Melinda's hair while the two women visited. Linda testified at trial that, during this visit, Melinda told her that she was afraid of the appellant because he had previously pulled a gun on her. Linda stated that, although Melinda had consumed one Zima in her presence, she did not appear intoxicated.

The two men were gone approximately two hours before returning to Norman Wallace1s residence. The two couples sat outside talking for approximately forty minutes before the appellant and Melinda left around 6:00p.m., headed in the direction of Stewart County. The Wallaces testified that there did not appear to be any discord between the appellant and Melinda at any point during the visit. In fact, the appellant frequently called Melinda "baby" or "honey" and he told Norman that he and Melinda "got along real good together" and that "he wanted him and Melinda to take off and go someplace and move out of the country and be together the rest of their lives."

Shortly after 7:00p.m., several customers at J.T.'s Bait Shop in Stewart County noticed a dark blue or black Fifth Avenue or LTD approaching from the direction of Clarksville. The vehicle drove onto the parking lot at a high rate of speed and then came to a sudden stop. The door on the driver's side of the vehicle opened and a man's foot emerged. The man leaned into the vehicle and appeared to have a shotgun in his hand. One witness, Heather Spiceland Stevens, testified that, when the car came to a halt, she observed the man slap his female passenger. A loud boom then reverberated from the vehicle and smoke came out the windows. Several bystanders

described what appeared to them to be the head of the female passenger exploding. The driver of the vehicle backed the car out of the parking lot and drove in the direction of Dover. When the car was approximately three hundred yards from the parking lot, the bystanders heard another loud noise. At trial, the witnesses at the bait shop/convenience store identified the appellant as the male driver of the vehicle and Melinda Perrin as the female passenger.

Stewart County Deputy Kenny Anderson responded to the dispatch regarding the shooting at J.T.'s Bait Shop. Once at the scene, Deputy Anderson found pieces of human flesh scattered on the ground, as well as pieces of bone and parts of a denture plate.

That same evening, Ronald Buchanan had observed a dark colored vehicle leave from a secluded area on Riversbend Road in Stewart County between 6:30 p.m. and 8:00p.m. and, later, had learned of the shooting incident at J.T.'s Bait Shop. The next afternoon, at around 3:00p.m., Ray Richardson, Ronald Buchanan, and Harold Chester decided to ride their four wheelers in the Wilson Hollow area of Riversbend Road in search of the dark blue vehicle. The men had ventured onto an old logging road about one hundred and fifty yards off of Riversbend Road.

They noticed fresh tire tracks on the road and Ray Richardson spotted an area where it appeared that something had been dragged through the weeds. The men decided to investigate. They found a body approximately fifty-six feet off of the logging road in the weeds. They notified the sheriffs department and led the authorities to the scene.

Dr. Robert Lee, the Stewart County Medical Examiner, and Tennessee Bureau of Investigation Special Agent Mike Breedlove arrived at the scene and discovered the body of a female, subsequently identified as Melinda Perrin, whose face had been obliterated by a shotgun blast. The body was sent to Dr. Charles Harlan, the chief medical examiner, who would conduct the autopsy.

Dr. Harlan determined that the thirty-nine year old victim had sustained a shotgun wound to the left side of the neck which was consistent with a near shotgun wound. As a result of the injury, the victim suffered multiple skull fractures, fractures of the jaw bone and the bone connecting the upper teeth, bruising to the brain, and a collapsed right eye. He opined that, after being struck by the shotgun blast to the head, the victim would have ceased being functional, and, most likely would have been rendered unconscious. The victim could have lived from between five to ten minutes from the delivery of the injury. Dr. Harlan determined that, based on the distance and angle of the gunshot wound, it would have been very difficult for the wound to have been self-inflicted. He was also able to determine that, at the time of death, the victim had a blood alcohol level of .12 per cent and that there were traces

of Fluoxtenine (a form of Prozac), Norpropoxyphene (the metabolic breakdown of Darvon, a painkiller), Dihydrocodeinone (a synthetic opiate) and ephedrine/pseudoephedrine (cold medicine) in her bloodstream.

On June 26, eighteen days after the homicide, the appellant turned himself in to authorities. That evening during visiting hours, Deputy Anderson overheard the appellant tell one of his visitors that he could not understand why he was a suspect because he was not even with the victim that day or at the time of the murder. Neither the appellant's vehicle nor the murder weapon were ever recovered.

At his subsequent trial, the appellant pled not guilty to the charge of premeditated murder, and, in defense suggested that the fatal wound had been self-inflicted. The jury rejected this theory and returned a guilty verdict as to the charge of premeditated first degree murder.

Wallace, 1998 WL 670627 at *1-4. The state court's other factual findings are set forth in the context of Petitioner's claims.

## B. Conclusions of Law

Petitioner's viable habeas claims, if timely, are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a

case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States"as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court conviction became final." Id. at 390; accord, Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," Williams, 529 U.S. at 409, and a district court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is

unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

## 1. Ineffective Assistance of Counsel

In Petitioner's post-conviction appeal, the Tennessee Court of Criminal appeals in Wallace V found as follows on Petitioner's ineffective assistance of counsel claim.

> In the petition for post-conviction relief, the Petitioner alleged that he received the ineffective assistance of counsel at trial because counsel did not properly investigate the charges, did not interview certain witnesses, did not object to certain evidence introduced at trial, did not object to certain arguments made by the prosecution at trial, and failed to introduce certain proof alleged to be beneficial to the Petitioner. The Petitioner also asserted that counsel was ineffective for advising the Petitioner not to testify at his trial. He also asserted in the petition that he had new evidence that the State's key witness, Dr. Charles Harlan, testified incorrectly about the cause of death. He also alleged that he had new evidence that the shotgun which was used to kill the victim had a "hair-trigger."

> \*   \*   \*

> A hearing on the Petitioner's petition was held on June 26, 2007, at which the Petitioner was the only witness. He testified that his trial counsel did not prepare him to testify, although the Petitioner told him his version of the events underlying the case. The Petitioner also said that he wanted to testify but that trial counsel was vehemently against it because of the Petitioner's prior criminal record. The Petitioner recalled that he originally answered in the affirmative when the trial court asked him whether he would testify. He and trial counsel then had a conference in which trial counsel reiterated his opposition. The Petitioner said that trial counsel never informed him he had a constitutional right to testify. After this conference, the Petitioner told the trial court that he would not testify, although the Petitioner maintained that he never waived his constitutional right to testify.

> The Petitioner said he would have testified that he pulled his car into J.T.'s Bait Shop and set one foot out of its driver's side door when he heard Melinda say she would "blow his brains out." He and Melinda wrestled with the shotgun. It fired during the struggle, killing Melinda. His defense therefore would have been that he was acting in self-defense in handling the shotgun but that the trigger pull was an accident.

The Petitioner also alleged that trial counsel never investigated the Petitioner's claim that Charles Morgan had told him the shotgun had a hair trigger. The Petitioner also said that trial counsel never spoke to Heather Spiceland Stevens. Rather than arguing that the shooting was an accident, trial counsel then argued in closing that Melinda had committed suicide. Overall, the Petitioner did not feel he received effective representation at trial.

On cross-examination, the Petitioner admitted that trial counsel had, in fact, asked Mr. Morgan whether or not the shotgun had a hair trigger. Mr. Morgan responded that it did not. The Petitioner explained the absence of the gun or his car, saying that he had left the car by the side of the road near Manchester after it blew a tire. The car was stolen by the time he returned. The State also read into the record and confirmed with the Petitioner an exchange in which the Petitioner told the court he would like to testify but that it was his decision not to after speaking with trial counsel. He was also advised that he had a constitutional right to testify.

The State did not present proof. The Stewart County Circuit Court denied the Petitioner any relief in a lengthy and thorough memorandum opinion dated July 3, 2008. This appeal followed.

Id. at 1, 4-5.

As to the merits of Petitioner's ineffective assistance of counsel claims,[2] citing federal law, the Tennessee appellate court ruled that Petitioner has not shown any prejudice for his trial counsel's cited failures.

The Petitioner argues that the post-conviction court erred in concluding that his "uncontroverted" testimony was insufficient to provide him relief. The Petitioner's brief contains a number of grounds on which he believes trial counsel was deficient, including trial counsel's failure to: (1) object to a certain witness being referred to as a "gun expert"; (2) object to the State's expressions of opinion on witness credibility; (3) object to the State's expression of opinion regarding the strength of evidence against the Petitioner relative to similar cases; (4) allow the Petitioner to testify; (5) object to the trial court's reference to the shotgun as "the murder weapon"; (6) introduce evidence of the Petitioner's non-violent character; and (7) object to the trial court's statement that the Petitioner had "apparently escaped from custody while his case was on appeal."

---

[2]As stated earlier, in Wallace V, the Tennessee Supreme Court granted Petitioner relief on his trial counsel's failure to file a timely motion for a new trial. 121 S.W.3d at 660. Petitioner was permitted to file his motion and received a delayed appeal.

We decline to address the issue of whether trial counsel was deficient in his representation on these issues. **The Petitioner has simply not demonstrated that the result of his trial would have been different but for the alleged errors. See Strickland, 466 U.S at 694. After our review of the record, we cannot conclude that the post-conviction court erred in holding that the Petitioner was not prejudiced by any alleged deficient representation. The State presented a strong case against the Petitioner, including the testimony of several eyewitnesses to the shooting. Other witnesses established that the Petitioner was with the victim in a vehicle matching the description of the one seen at J.T.'s Bait Shop and that he had a shotgun with him. Witnesses also established that the victim's body had been driven to a remote location and discarded. Based on our review of the record, we cam1ot conclude that the trial court erred in finding that the Petitioner was not entitled to post-conviction relief based on the ineffective assistance of counsel.**

Id. at 6-7 (emphasis added).

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

These standards require no special amplification in order to define counsel's duty to

investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). A court must

17

examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, 2000WL712376 *3 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694.

Although Petitioner asserts trial counsel's failure to present specific theories at trial, these omissions were found by the state courts not to rise to the level of "entirely fail[ing] to subject the prosecution's case to meaningful adversarial testing." Id. Thus, a "strong presumption" arises that petitioner's counsel provided reasonably effective assistance. Strickland, 466 U.S. at 689. Petitioner has not presented proof that the state courts' findings on the lack of any prejudice from these omissions was error. Thus, the Court concludes the Tennessee Court of Criminal Appeals was not unreasonable in applying federal law.

## 2. Prosecutorial Misconduct Claim

Petitioner did not raise this claim in either of his direct appeals. See Wallace I, 1998 WL 670627; Wallace V, 2005 WL 292438. Tennessee courts hold that "issues [of prosecutorial misconduct] are more properly the subject of direct appeal; as such, they are waived in the post-conviction setting. John C. Johnson v. State, No. 2004-02675-CCA-R3-CO, 2006 WL 721300, at *18 (Tenn.Crim.App., Nashville, Mar. 22, 2006) and (citing Tenn. Code Ann. § 40-30-106(g)). Moreover, in Wallace V, the Tennessee appellate court found waiver of this claim involving

improper closing argument and vouching for a witness. 2009 WL 3031261 at *7. The only

exception was in the context of suppression of exculpatory evidence that is discussed below. With

this exception, the Court considers Petitioner's prosecutor misconduct claims and procedurally

defaulted without any showing of cause or prejudice.

### 3. Exculpatory Evidence

For this claim, the Tennessee Court of Criminal Appeals found the following facts and

concluded the cited exculpatory evidence was not material.

> At the defendant's post-conviction hearing, **the defendant claimed that the state
> had suppressed a June 10, 1996 Tennessee Bureau of Investigation (TBI)
> interview of Linda Wallace wherein she said that the victim told her that she
> was not afraid of the defendant. <u>Wallace III</u>, slip op. at 3. Trial counsel testified
> that he did not receive or see the report. Trial counsel explained how he could
> have used the report to impeach Linda Wallace at trial and to undercut the
> state's case. <u>Id.</u>, slip op. at 3-4. Prosecution counsel testified at the
> post-conviction hearing that he followed an open-file discovery policy; he
> believed that the document was in the case file when it was offered to trial
> counsel to review and photocopy. <u>Id.</u>, slip op. at 4.**

> \*   \*   \*

> Essential the evidence at trial showed that the victim was the defendant's girlfriend.
> On June 8, the couple drove to the home of Charles Morgan, the defendant's friend,
> where the defendant prevailed upon Morgan to sell to him a sawed-off pump shot-
> gun and two shells. <u>Id.</u>, slop op. at 2-3. The defendant ant told Morgan that "he
> needed the shotgun for protection because somebody was threatening to kill him."
> <u>Id.</u>, slip op. at 3.

> \*   \*   \*

> **During the men's absence, the victim and Linda Wallace conversed casually.
> Linda Wallace testified at trial that "during this visit, Melinda told her that she
> was afraid of the [defendant] because he had previously pulled a gun on her."
> <u>Id.</u> Other than that statement, both Norman and Linda Wallace testified that
> there did not appear to be any "discord" between the victim and the defendant;
> in fact, the defendant frequently addressed the victim as "baby" or "honey" in
> the Wallaces' presence. <u>Id.</u>**

Later that day, shortly after 7:00 p.m., several patrons at J.T.'s Bait Shop in Stewart County noticed a dark-colored vehicle pull into the parking lot at a high rate of speed and come to an abrupt stop. Id., slip op. at 5. The driver's side door opened, and a man's foot appeared. Bystanders heard a loud boom and saw smoke emerge from the car windows; one witness described what appeared to be "the head of the female passenger exploding." Id . After the explosion, the driver drove out of the parking lot. At trial, the witnesses identified the defendant as the driver and the victim as the female passenger. Id.

The following day, the victim's body was discovered in a remote area in Stewart County. Id., slip op. at 5-6. Eighteen days after the shooting, the defendant voluntarily surrendered to law enforcement authorities. Investigators never recovered the murder weapon and never located the defendant's vehicle. Id., slip op. at 6-7. At trial, the defendant suggested that the victim's fatal wound was self-inflicted. The jury disagreed and convicted the defendant of premeditated, first degree murder. Id., slip op. at 7.

*　*　*

**The defendant claims that the prosecution withheld certain exculpatory materials that should have been disclosed to him prior to trial and that the omission is tantamount to prosecutorial misconduct. The defendant's post-conviction counsel learned that, prior to trial, the prosecution had possession of a TBI report recounting Linda Wallace's statement to a TBI agent that, on the day of the shooting, the victim was not fearful of the defendant. The report was not furnished to the defense prior to trial and did not surface until the defendant's post-conviction petition was pending. The defendant claims that the failure to disclose the report prior to trial deprived him of due process and a fair trial.**

In overruling the motion for new trial, **the trial court found that the state should have known that statements of the state's proposed witnesses were included in the defendant's pretrial request for disclosure; however, the court found that the state did not suppress the report. Specifically, the court found that defense counsel had inspected the state's file pursuant to the prosecutor's "open file" policy. The court did not equate defense counsel's not remembering seeing the report with the state's suppressing it. The trial court determined that the content of the report was marginally exculpatory** FN2; however, **the court thought that the use of the report and the possible impeachment of Ms. Wallace would have been far more critical to the defense on the issue of premeditation. In view of this court's finding of insufficiency of evidence of premeditation and reversing the first degree murder conviction, the trial court saw little potential for prejudice in the failure to disclose the report.** Finally, the trial court determined that the report was not material because it did not represent a reasonable

probability of a different result at trial.

We agree with the trial court's analysis that the defendant failed to prove materiality as a prerequisite to a Brady due process claim. Above we cited factors that attenuated the defendant's claim that reversible error resulted from the trial court's allowance of hearsay evidence. The same factors minimize the likelihood of prejudice resulting from the failure to disclose the TABI report. Independent eyewitness testimony, accredited by the jury, cannot be reasonably reconciled with the defendant's claim that the victim accidentally shot herself. Moreover, **the trial court aptly commented that both Ms. Wallace's testimony and the contradictory TBI report were more poignant when premeditation was an element of the conviction offense. All in all, we conclude that the record supports the trial court's detem1ination that no deprivation of due process occurred.**

\*   \*   \*

I. Admission of Hearsay Testimony.

Linda Wallace, the wife of the defendant's cousin, was called as a state witness. Ms. Wallace testified over objection that when the defendant had left her and the victim alone on the day of the homicide, the victim told Ms. Wallace that she feared the defendant because he had previously pulled a gun on her. The defendant claims that Ms. Wallace's testimony was inadmissible hearsay and that he was prejudiced from the use of the hearsay testimony because his defense theory was that the victim had accidentally discharged the shotgun. He points to evidence that barely more than an hour before the shooting, he and the victim were companionable and that he addressed the victim in endearing terms. The state counters that the trial court correctly admitted the hearsay. After a jury-out hearing on the hearsay issue, the trial court found that the state could introduce the hearsay statement via the hearsay rule exception for illustrating the declarant's state of mind. The trial court found that the defendant had "opened the door" by eliciting testimony on cross-examination of witnesses that the victim and the defendant evinced no animosity to each other. The state posits that the trial court allowed the introduction of Ms. Wallace's recounting of the victim's statement as a means of showing the victim's state of mind. The state argues that the decision was well within the discretion of the trial court, especially when the court cautioned the jury to consider the evidence only for purposes of evaluating the victim's state of mind. Furthermore, the state argues that if the trial court erred in admitting the victim's statement, the error was harmless based upon the overwhelming evidence that belied the defendant's theory of the case.

\*   \*   \*

In the present case, the state posits that the victim's extrajudicial statement was admissible as a declaration of her state of mind. Tennessee Rule of Evidence 803(3) addresses the hearsay rule exception for "then existing" mental, emotional, or

physical condition:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Tenn. R. Evid. 803(3). The Advisory Commission for the Rules of Evidence opines that "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." See id. 803(3), Advisory Comm'n Comments (emphasis added).

We hold that the trial court erred in admitting Ms. Wallace's testimony of the victim's extrajudicial statement. The statement was hearsay. Whatever else can be said about the purpose of introducing the statement, its import lies in the fact that the victim feared the defendant, as her statement attests. Thus, it was effectively offered to prove the truth of the matter asserted by the declarant. As hearsay, however, the testimony nevertheless may have been admissible pursuant to the state of mind exception to show the victim's-as opposed to the defendant's-then existing state of mind. That said, we must conclude that the victim's state of mind is not relevant to any material issue at trial. See Tenn. R. Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); id. 402 ("Evidence which is not relevant is not admissible.").

*   *   *

Witnesses to the victim's shooting testified that the defendant was in the vehicle with the victim, contrary to the defendant's pretrial claim that he was not present. The witnesses saw the defendant drive a dark car swiftly into the bait shop parking lot. The car stopped abruptly. Ronald Green thought he saw a "sawed-off shotgun" in the defendant's hand just before hearing the shot. After the gunshot, he saw the defendant close the car door and drive away, but he and two other witnesses heard another shot before the car traveled 200 to 300 yards. The jury heard other testimony that the shotgun purchased by the defendant earlier in the day was a pump shotgun that required the operator to pump a new shell into the chamber after each discharge. Heather Stevens saw the defendant and the victim in the car and saw the defendant slap the victim. She testified that the defendant then opened his car door, placed a foot outside the car, reached toward the floor, and pointed an object toward the victim. Ms. Stevens then heard a shot. She saw smoke and the victim's head exploding. The jury heard an expert's medical opinion that the victim probably did not self-inflict the fatal gunshot wound.

Thus, we are unpersuaded that the testimony regarding the victim's professed fear of the defendant affected the jury's verdict. Curiously, we may have attributed significantly more prejudice to the admission of the victim's hearsay statement had the defendant claimed at trial that he accidentally shot the victim. His defense that the victim shot herself, however, is squarely at odds with the testimony of apparently disinterested witnesses who saw him point an object at the victim and who heard a second gunshot emanating from the car. We conclude that the jury accredited these witnesses, and we doubt that the victim's hearsay statement substantially impacted the jury's verdict.

Id. at *1-2. (emphasis added).

Here, Petitioner fails to show that the Tennessee Court of Criminal Appeals determination was contrary to clearly established federal law. Thus, the Court concludes that the state appellate court's conclusion on this claim is not contrary to applicable federal law.

For these collective reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed here within.

**ENTERED** this 27 day of February, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court